AARON C. GOODMAN vs. THE MERIDEN BRITANNIA COMPANY.

A contract was entered into by the vendor and vendee of certain trade-marks, by which the vendor was to receive $500 per month, payable monthly in advance, for ten years, with the following provision:— "The payment of said sum shall at all times be dependent upon the vendee being fully secured in the exclusive use of said trade-marks, and if any other party shall establish his right to use either of them said payments shall thereupon cease." The vendee was undisturbed in the exclusive use of the marks and made the monthly payments for five years, when the debt was attached by a creditor of the vendor. Held that the securing of the vendee in the exclusive use of the marks was not a condition precedent of the obligation to make the monthly payments, but that a present indebtedness was created for the whole amount which could be taken by foreign attachment.

The obligation of the vendee to continue to make the monthly payments would of course cease if at any time any other party should establish his right to use the marks.

SCIRE FACIAS upon a process of foreign attachment; brought to the City Court of the city of Hartford and by the appeal of the defendants to the Superior Court for Hartford County, and heard in that court, upon a denial of indebtedness on the part of the defendants, before *Beards-ley, J.* The action in which the defendants were garnisheed was brought against William Rogers. The following facts were found by the court.

On March 16th, 1868, the following contract was entered into by the defendants with William Rogers and William Rogers, Jr., the latter being the William Rogers above mentioned:—

"This agreement made and concluded this 16th day of March, 1868, by and between the Meriden Britannia Company, a joint stock corporation, organized and existing under the laws of the state of Connecticut relating to joint stock corporations, and located at Meriden, party of the first part, and William Rogers and William Rogers, Jr., both of Hartford, Connecticut, parties of the second part, witnesseth—

"That the party of the first part, in consideration of the promises, covenants and agreements of the parties of the second part herein contained, hereby promises, covenants and agrees, to and with said parties of the second part, to pay the said parties of the second part jointly, or to the survivor of them, in the case of the death of either of them, the sum of five hundred dollars per month, payable in advance each month, for the period of one hundred and twenty months, commencing on the 20th day of March, 1868.

"In consideration of said promise and agreement of said party of the first part, said parties of the second part do for themselves both jointly and severally covenant, promise and agree with said party of the first part, as follows, to wit:

"1st. That they will, and each of them will, during the period aforesaid, use the influence they have in the market to secure trade for said party of the first part in the articles of silver-plated forks and spoons and other silver-plated ware.

"2d. That said party of the first part shall have and enjoy the sole and exclusive right to the use of certain trade-marks heretofore used by the parties of the second part, to wit: '‡ Wm. Rogers & Son, A. A;' also '1847, Rogers Bros. A. I.,' upon all silver-plated forks and spoons made or sold by said parties of the first part after the 20th of March, 1868. And said party of the first part may authorize the use of said trade-marks, or either of them, upon spoons and forks manufactured or sold by other parties, where said party of the first part is to be benefited by the manufacture or sale thereof.

Goodman v. Meriden Britannia Co.

"That they the said parties of the second part will not, and neither of them shall use either of said trade-marks, during all the period aforesaid, or any other trade-mark or stamp in which the name of Rogers shall be used or form a part thereof, or engage in the business of making spoons or forks, either directly or indirectly.

"That they will not allow, suffer or permit any other person or persons, party or parties, to use, infringe upon, or imitate either of the trade-marks aforesaid, to wit: '‡ Wm. Rogers & Son, A. A.,' and '1847, Rogers Brothers, A. I.,' and that they will not permit, suffer or allow any other person or party, persons or parties, to use the name of the said William Rogers or of the said William Rogers, Jr., upon any stamp or trade-mark upon silver-plated forks and spoons or other plated ware, during the period aforesaid; but that the right of the said party of the first part to the use of the said trade-marks and each of them, and to the use of the name of the said William Rogers, and of said William Rogers, Jr., upon forks and spoons, shall be sole and exclusive to the said party of the first part.

"And whereas certain parties in Hartford, to wit: Thomas Birch and William J. Pierce, are now using the trade-mark, '‡ William Rogers & Son, A. A.,' it is understood that the aforesaid payment is not to commence until said parties of the second part, at their own expense, shall have enjoined said Birch and Pierce, and prevented the use of said trade-mark by them.

"And it is further understood and agreed, that the payment of said sum shall at all times be dependent upon said party of the first part being fully secured and protected in the exclusive use of said trade-marks, and that if any other person or party shall establish their right to use either of the aforesaid trade-marks, said payments shall thereupon cease. But all suits that may be necessary to defend them in the use of said trade-marks, shall be maintained at the expense of said parties of the first part, except only in the case of said Birch and Pierce; and if necessary to use the names of said William Rogers and William Rogers, Jr., or

either of them, in any suit for the protection of said parties of the first part, the same is hereby authorized.

"Said parties of the second part further promise, covenant and agree that the said William Rogers shall, if able, several times in each year, when required by said party of the first part, visit the large Atlantic cities and solicit orders for said party of the first part, said party of the first part to pay his necessary traveling expenses.

"It is also expected that the said William Rogers, Jr., will also from time to time travel to solicit orders, in which case his necessary traveling expenses shall be paid by said party of the first part, but such services shall not be compulsory, and the omission of either said William Rogers or William Rogers, Jr., to travel shall not invalidate this contract.

"It is also expected that the said William Rogers and William Rogers, Jr., will from time to time render service during said period to said party of the first part at the factory or office of the party of the first part. But an omission to perform the same shall not invalidate this contract. And no compensation additional to the payment of said sum of five hundred dollars per month is to be paid said parties of the second part, or either of them, for any of the services aforesaid.

"The said party of the first part also agrees to withdraw all suits in law or equity now pending against said William Rogers or William Rogers, Jr., for the benefit or in the name of the Meriden Britannia Company, and all actions and grounds of action against them, or either of them, are hereby discharged by said Meriden Britannia Company."

On the 1st day of January, 1872, the following modification of the contract was made :—

"The Meriden Britannia Company agree to pay the full amount called for by this contract from January 1, 1872, and to waive the performance by the parties of the second part of all conditions in this contract, in relation to the use of the name Rogers by the concern in Hartford, and consider and admit the claims of Wm. Rogers and Wm. Rog-

ers, Jr., to the full amount of ($500) five hundred dollars per month, as specified in this contract, to be in full force from January 1, 1872, and thereafter until the expiration of this contract. MERIDEN BRITANNIA CO.,

by H. C. WILCOX, *President.*"

William Rogers, senior, died February 13th 1873. The present plaintiff brought his action against William Rogers, (the William Rogers, Jr., of the foregoing contract,) on the 21st of February, 1873, factorizing the defendants as his debtors. Due service was made on them, and in the action the plaintiff recovered a judgment against Rogers for $2,749.57 damages, and $32.25 costs of suit. Demand was duly made on the execution upon the defendants, but they denied all indebtedness to Rogers. There was in fact no indebtedness except such as grew out of the contract mentioned.

Before February 21st, 1873, the defendants had paid to the Rogerses all sums of money falling due to them under the contract.

Upon these facts the court held the defendants to be indebted to William Rogers (defendant in the factorizing suit) and rendered judgment for the plaintiff. The defendants brought the record before this court by a motion in error.

*F. Chamberlin* and *J. P. Platt*, for the plaintiffs in error.

A debt due, but payable in the future, may be garnisheed; but all the authorities agree that such claim, in order to be garnishable, must be an absolute debt, which will certainly become payable upon the lapse of time, and that a contingent liability, which may or may not become a debt due, can not be the subject of garnishment. This is the very language of SHAW, C. J., in *Wyman* v. *Hichborn*, 6 Cush., 264. The check of a third party, payable to the order of the supposed trustee, is not attachable by trustee process, because there is a possibility that it may never be paid. *Lane* v. *Felt*, 7 Gray, 491; *Hancock* v. *Colyer*, 99 Mass., 187; *Knight* v. *Bowley*, 117 id., 551. "The debt from the

garnishee to the defendant, in respect to which it is sought to charge the former, must moreover be absolutely payable, at present or in future, and not dependent on any contingency. If the contract between the parties be of such a nature that it is uncertain and contingent whether anything will ever be due by virtue of it, it will not give rise to such a credit as may be attached; for that cannot properly be called a debt, which is not certainly and at all events payable, either at the present or at some future period." Drake on Attachment, § 551.

By the contract of March 16th, 1868, the Rogerses agree: —1st. That for "120 months" they will use their influence in the market to secure trade for the Meriden Britannia Company.—2d. That the company shall enjoy the sole and exclusive right to the use of certain trade-marks, theretofore used by the Rogerses, upon all silver-plated forks and spoons made by the company after March 20th, 1868.—3d. That they will not, during such ten years, use either of said trade-marks, or any other trade-mark, embracing the name of Rogers.—4th. That they will not engage, directly or indirectly, during such period, in the business of making spoons or forks.—5th. That they will not permit any other party to use, infringe or imitate either of said trade-marks. —6th. That they will not allow any other party to use the name of Wm. Rogers or of Wm. Rogers, Jr., upon any stamp, upon silver-plated forks and spoons or other plated ware.—7th. That Wm. Rogers should, if able, visit the large Atlantic cities and solicit orders, several times each year. The Meriden Britannia Company agree, in consideration of these promises:—1st. To pay to the Rogerses jointly, or to the survivor of them, $500 per month, in advance, for 120 months, from March 20th, 1868.—2d. To withdraw all suits pending against them, and discharge all grounds of action.—3d. That all spoons and forks upon which such trade-marks might be used should be plated with certain prescribed quantities of silver. Both parties agree:—1st. That said payment shall not commence until the Rogerses shall, at their own expense, have enjoined

Birch and Pierce, (who were then using one of the trade-marks), and prevented its use by them.—2d. *That the payment of $500 per month in advance shall, at all times, be dependent upon the Meriden Britannia Company being fully secured and protected in the exclusive use of said trade-marks.* —3rd. *That if any other party shall establish its right to use either of said trade-marks, said payments shall thereupon cease.* The contract also recites that the Rogerses are expected to render service during the term at the company's factory or office, and that Wm. Rogers, Jr., is expected to travel to solicit orders, but provides *that the omission of either to travel to solicit orders or perform service at the factory or office, shall not invalidate the contract,* and that no compensation additional to the $500 per month shall be paid on account of their services.

We submit:

1. That the parties to this contract *expressly* made each monthly payment *contingent.* Such payment was "*at all times to be dependent* upon the Meriden Britannia Company being fully secured and protected in the exclusive use of the trade-marks." It was, therefore, at all times, *uncertain* whether any future monthly payment would become due, for, at all times, there must have been a possibility that the company would not be fully protected in the exclusive use of the trade-marks. Besides, if any other party established his right to use either of the trade-marks, the payment was thereupon to cease. This was a contingency which must always have been a possibility liable to put an end to the monthly payments.

2. The provisions of the contract clearly indicate that the parties intended substantial performance to be a condition precedent to a continuance of the contract. *Expressio unius est exclusio alterius;* and while the contract states that it is expected that the Rogerses will travel and render service at the factory, it expressly provides that a failure so to do *shall not invalidate the contract.* Manifestly a failure to perform the express agreements *would invalidate it.*

3. The nature of the agreements to be performed by the

Rogerses, and the general character, spirit and purpose of the entire contract, show that performance by them was intended to be a condition precedent to payment. The object of the contract was to secure to the company a *monopoly* of certain trade-marks. Those trade-marks had derived their value from the Rogerses, and their future worth to the company depended upon their fidelity to their covenants. Without continued performance by them, there would be such a failure of consideration as to bar their right to payment.

4. To hold the company's covenant to pay to be independent of the several covenants of the Rogerses to perform, would manifestly work great injustice. Such construction would make the company liable for the whole $60,000, although the death of both the Rogerses within a few days after the execution of the contract might make it valueless. Such construction would oblige the company to continue the monthly payments after their failure to secure to it the exclusive use of the trade-marks had removed the consideration of the contract. The importance of such " exclusive use " in the minds of the parties is shown by the provisions, that " payment is not to commence until the use of the trade-marks by certain parties in Hartford shall have been enjoined, at the expense of the Rogerses; " and " that payment shall at all times be dependent upon the company being fully secured and protected in such exclusive use." Such construction would make the company liable for the full $60,000, although the Rogerses, by a refusal to use their influence to secure trade, by a personal use of the trade-marks, by engaging in the business of making spoons, or by a grant to others, might have violated the letter and spirit of all their covenants, and have made the contract entirely worthless to the company. " The question whether mutual covenants are dependent, is one," says SHAW, C. J., " which has been much agitated in courts of law, and sometimes has been the subject of very subtile distinctions, but it depends upon the intention of the parties and the nature of the respective stipulations, and is to be determined rather from

the sense of the whole taken together, than upon any particular form of expression." And our own court in the case of *Leonard* v. *Dyer*, 26 Conn., 172, adopted the rule stated by Chief Justice TINDAL, and approved the same in the late case of *Curtis* v. *Alvord*, 45 Conn., 571—" that the question whether covenants are to be held dependent or independent of each other is to be determined by the intention of the parties as it appears on the instrument, and by the application of common sense to each particular case; to which intention, when once discovered, all technical forms must give way." It was undoubtedly the *intention* of the parties to this contract that their mutual covenants should be dependent; that payment should be contingent upon the performance by the Rogerses of their covenants; and that a failure on their part to fully secure to the company such a monopoly of their influence and their trade-marks as this contract provided for, should release it from all obligation to pay. This contingent character of the indebtedness is not in any way changed or affected by the waiver which grows out of a single clause in the contract, and relates to that clause alone.

*C. E. Perkins* and *F. L. Hungerford*, for the defendant in error, cited *Enos* v. *Tuttle*, 3 Conn., 27; *Thompson* v. *Stewart*, id., 183; *Fitch* v. *Waite*, 5 id., 117; *Todd* v. *Hall*, 10 id., 544; *Culver* v. *Parish*, 21 id., 408; *Coburn* v. *City of Hartford*, 38 id., 290; *Curtis* v. *Alvord*, 45 id., 569; *Burke* v. *Whitcomb*, 13 Verm., 421; *Downer* v. *Topliff*, 19 id., 399; *Downer* v. *Curtis*, 25 id., 650; *Sargent's Admr.* v. *Kimball's Admr.*, 37 id., 320; *Dwinel* v. *Stone*, 30 Maine, 384; *Smith* v. *Cahoon*, 37 id., 281; *Ricker* v. *Fairbanks*, 40 id., 43; *Cutter* v. *Perkins*, 47 id., 557; *Ware* v. *Gowan*, 65 id., 534; *Webber* v. *Doran*, 70 id., 140; *Thorndike* v. *De Wolf*, 6 Pick., 120; *Holbrook* v. *Waters*, 19 id., 354; *Wheeler* v. *Bowen*, 20 id., 563; *Boston Bank* v. *Minot*, 3 Met., 507; 1 Swift Dig., 228; 2 Parsons on Cont., 16.

PARDEE, J. (After stating the case.) The question to be

answered is, did the defendants owe a debt to William Rogers, Jr., on February 21st, 1873, by virtue of their contract of March 16th, 1868?

The provisions bearing upon this are, that William Rogers and William Rogers, Jr., claiming to be sole owners of a trade-mark in connection with the manufacture of silver-plated ware, in consideration of the sum of $60,000, payment to be made in one hundred and twenty equal monthly installments in advance, sold to the defendant the sole and exclusive right to use the mark for the term of ten years and promised not to attempt to grant any right to use it during that term to any other person. But inasmuch as both parties knew that by reason of the fact that Birch and Pierce were then in the actual use of it under claim of grant from the vendors, and intended to continue such use, the latter could not put the vendee in possession of the right sold, it was made a condition precedent to the existence of any debt that the vendors should cause Birch and Pierce to be placed under permanent injunction. It was also agreed that if at any time during the term any person should prove in a judicial proceeding instituted for that purpose that the vendors were not at the time of the execution of the contract the owners of the right attempted to be conveyed, no installments should thereafter become payable. This provision does no more for the defendant than the law would have done in its absence; and these two possibilities, namely, that a vendor may not have title to the thing sold, although he has and delivers possession, and that he may fraudulently attempt to sell to *A* that which he had previously sold and delivered to *B*, attend every contract of sale; and if permitted in this, would in every instance of payment deferred prevent the existence of an attachable debt; and this in cases in which payment is to be made once for all, as well as in those where it is to be made in installments; in cases where the evidence is in the form of a note negotiable, or of a charge on book, as well as in those where the promise rests in parol. But they are neither of them, as a matter of legal necessity, a condition

precedent to the existence of indebtedness for the price of property sold and delivered.

Moreover, in this case the parties made a sharply defined distinction between the certainty that the grantors could not deliver anything of value under the contract until Birch and Pierce should be placed under injunction, and the bare possibilities either that some person of whom the defendant had neither knowledge nor suspicion should at some time be able to prove himself the owner of the mark, or that the vendors would fraudulently undertake to sell to another that which they had previously sold and delivered to it. Until the defendant was made sure that no harm could come to it from the claim of Birch and Pierce it would neither pay nor come under obligation to pay; being certified upon that point it in 1872 withdrew this condition precedent and began to pay. Having possession of the exclusive right purchased, it established the existence of the debt for the price in its entirety by beginning and continuing to pay in advance installments thereon as fractions of a whole. The possibility of failure of title then existed and co-existed with the recurring payments to the end of the term; but the defendant did not by reason thereof require the vendors, nor did they permit it, to postpone the payment until the expiration of the term; did not require them, nor did they permit it, to postpone for a day even; did not require, nor did they furnish, security for the return of payments made. It paid each installment, not as an independent debt; not as the price in advance of the use of the mark for an isolated month; but as a constituent part of a debt for the gross sum of $60,000 for its use for a term of ten years, and as such the vendors received it. The defendant knowingly and intentionally assumed the risk of promising that its debt should be constantly and regularly diminished as the term wore away, regardless of these possibilities. Evidently it was satisfied with this measure of defence against them, namely, if either of them should ripen into a certainty, that fact should be its protection against the demand for further payments.

The question whether either of the possibilities referred to is to be regarded as a condition precedent or as one subsequent is to be determined by discovering the intent of the parties; to be found in what they have written, interpreted in the light of what they have done. There can be no more convincing evidence that a man believes that he owes a debt than his voluntary payment; no more convincing evidence that he does not regard a given possibility as a condition precedent to his becoming indebted than his intentional and persistent disregard of it in his voluntary payment of installments while it exists; no more convincing evidence that a man believes that a debt is due to him than the reception of installments upon it.

We think that when the trustee process was served upon the defendant it was indebted to William Rogers in the unpaid balance of $60,000. Of course the condition, as a condition subsequent, still follows the indebtedness, and if at any time the defendant should lose the exclusive use of the trade-mark through the establishment of a right to it in some other party, its obligation to continue the payments would cease.

There is no error in the judgment complained of.

In this opinion the other judges concurred.